# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8581 | **DATE** | 2/20/2004 |
| **CASE TITLE** | VALENTI, et al. vs. CITY OF CHICAGO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment (doc. #37);
Defendant's Motion to Strike the Declarations of Ed Fox (doc. #57) and Brad Cummings (doc. #58);
Defendant's Motion to Strike Portions of Plaintiff John Valenti's Declaration (doc. #59)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion. Defendant's motion for summary judgment (doc. #37) is GRANTED in part and DENIED in part. The Defendant's motion for summary judgment with regard to Mary Valenti's ADA claim and John Valenti's retaliation claim is GRANTED. The Defendant's motion for summary judgment with regard to Mary Valenti's discrimination claim (based on disparate treatment) and hostile work environment is DENIED. The Defendant's motions to strike (doc. #57, 58, and 59) are DENIED as moot. Status hearing set for 3/8/04 at 9:30 a.m. to set trial schedule or discuss settlement.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | 66 |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| JHC | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
04 FEB 20 PM 6: 21
FILED-ED 10

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MARY VALENTI AND JOHN VALENTI | ) | |
| | ) | FEB 2 3 2004 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 01 C 8581 |
| | ) | |
| | ) | The Honorable William J. Hibbler |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Mary and John Valenti, husband and wife, sued the City of Chicago, alleging several violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* According to the Valentis, the Chicago police department discriminated against Mary Valenti because of her gender and retaliated against John Valenti for opposing the discriminatory work environment. Mary Valenti raises claims for disparate impact, disparate treatment, and hostile work environment.[1] The Defendant moves for summary judgment. For the reasons noted herein, the Defendant's motion is GRANTED in part and DENIED in part.

### I. Factual Background

---

[1] Mary's also claimed the Defendant violated the Americans with Disabilities Act. In her response to summary judgment, Mary withdraws this claim. Therefore, Defendant's motion for summary judgment with regard to Mary's ADA claim is GRANTED.



John Valenti joined the Chicago Police Department in 1981, and Mary Valenti (for clarity and simplicity, the Court will refer to the two Plaintiffs by their first names for the remainder of this opinion) joined ten years later. After completing her training, Mary was assigned to the 25th District, where she spent her entire career as a police officer. Mary first worked as a patrol officer and occasionally worked at the 25th District desk and in the female lockup. In 1998, Mary was transferred to the 25th District's Community Policy Office (CPO) as a Domestic Violence Officer. Although the shift to the CPO did not result in an increase in salary or a promotion, Mary did enjoy more convenient hours, working 8:00 a.m. to 4:00 p.m., Monday through Friday.

When Mary began working in the CPO, Officers Evelyn Lampignano, John Behnke, John Apel, Gladys Morales, Sharon Loni, Lucy O'Brien, Joseph Graziano, and Jeff King were already assigned to the office. Sergeant Albert Oseguera supervised the 25th District's CPO from August 1998 until his retirement in January 2001. Sergeant Oseguera reported to Thomas Walton, the Commander of the 25th District.

In September 1999, Oseguera called Mary into his office. In the office, Oseguera described what he called "every man's" sexual fantasy to Mary, providing a graphic description of a sexual relationship involving a man and two women. Mary said nothing and Oseguera continued with his inappropriate behavior, discussing his methods of meeting women while drinking with his friends. Mary continued to remain silent, and Oseguera continued the inappropriate discussion. Oseguera concluded his lewd remarks by informing Mary that if she were not married, "[they] would be dating." Mary did not respond to Oseguera's inappropriate comments and left his

2

office. After the September 1999 conversation, Mary attempted to avoid being in the same area with Oseguera by herself.

Although the Chicago Police Department had a zero tolerance policy for sexual harassment, Mary did not complain about Oseguera's behavior because she feared that he might retaliate against her. Mary also did not immediately tell her husband about Oseguera's improper comments. Instead, Mary told several coworkers about Oseguera's remarks. It is clear, however, that Mary was not the only officer in the CPO to believe that Oseguera's managerial skills left much to be desired. Other officers confirmed that they feared to criticize Oseguera's decisions for fear that he might retaliate. Moreover, other officers confirmed that Oseguera frequently made comments evidencing his belief that women should not be part of the police force and also made patently offensive comments about women. For example, Officer Loni testified that Oseguera frequently voiced his opinion that women should not be on the police force.[2] Officer Graziano testified that Oseguera made other incendiary and offensive comments about women: 1) that he stated the only thing women are "good for is fuck them and run them;" 2) that he stated women are "ruining the police

---

[2] In their statement of facts, the Plaintiffs point to the testimony of Sharon Loni, claiming that she "testified that Oseguera frequently said that he believed that women have no business working at the police department." Pl. 56.1 Statement of Additional Facts ¶ 21. The Defendant moves to strike this paragraph, claiming that is vague and inaccurately characterizes Loni's testimony. Loni's precise testimony was that "[Oseguera] didn't think women should be on the job. He said that a million times." Loni Dep. at 58. The Defendant's objection is frivolous and the Plaintiff's characterization of Loni's testimony is anything but vague or inaccurate.

department;" 3) that he frequently referred to women using offensive, gender-specific derogatory names;[3] 4) that he threatened to put women back on the street; and 5) that he called Mary a "[pejorative][4] because she's trying to do all this stuff here" and that "she thinks she's going to outsmart me, you know. I'll just get rid of her."

In November 1999, Mary had a vacation (referred to by the department as a furlough) scheduled from November 25 to December 6. Mary sought to extend her furlough by using personal and compensatory days so that her furlough would coincide with her husband's, which ran after December 6. Oseguera denied her request to extend the furlough because Officer Morales, the other CPO Domestic Violence Officer, had already requested a furlough for those same dates. While Mary was on furlough, she learned that Oseguera planned to reassign her from the CPO back to the watch, where she might not work regular nine-to-five, Monday-Friday hours. Mary called Oseguera at home to inquire whether she was being "dumped" from the CPO. Oseguera explained that he recommended to the District Commander that she return to the watch because he had heard that Mary was unhappy with a recent change in the CPO hours and that her furlough extension was denied. The conversation between Oseguera and Mary became heated as Mary explained that she did not wish to be

---

[3] The Court will not reprint Oseguera's language here. Suffice it to say that the names Oseguera allegedly used are not appropriate for this, or any other, forum.

[4] Again, the Court sees no need to give voice to Oseguera's offensive and pejorative slang.

4

assigned to the watch but instead desired to remain in the CPO.[5] Despite Mary's objection to the transfer, Oseguera recommended that Commander Walter transfer her and he did so.[6] Mary was not the only officer who found herself transferred from the CPO during Oseguera's tenure there: Officers Curry, Loni, and Morales (all women) also were transferred

Mary's furlough was scheduled to end on December 17, 1999. But instead of returning to work, Mary informed the Department she was going on the medical roll because of stress, as directed by her psychiatrist, Dr. Gustavo Hernandez. While Mary was on medical leave, she and John met with Deputy Chief Byrne in December 1999 to discuss why Mary had been reassigned to the watch. Mary failed to convince Byrne to return her to the CPO. In February 2000, Mary received her performance evaluation for the June 1999 to December 1999 period. In that evaluation, Oseguera lowered Mary's efficiency rating from 99 to 96.5, noting that Mary needed to work on

---

[5] The Defendant claims that Mary used profanity during this conversation and points only to Oseguera's deposition in support. Mary, however, denies that she used any profanity, and points to her deposition in support. Local Rule 56.1 requires parties who move for summary judgment to file a statement of "material facts as to which the moving party contends there is no genuine issue." Quite obviously, there is an issue here, and Defendant's assertion that there is no dispute over the fact that Mary used profanity during the phone conversation is improper. Summary judgment is not the place to determine credibility issues. By including statements of fact that are at issue, the Defendant undermines its assertion that there is not a disputed issue of material fact and also makes the Court's job in sifting through the facts more difficult.

[6] Defendant offers no explanation if Oseguera believed that Mary wanted to be transferred, he persisted with the transfer after learning directly from Mary that she did not desire to be transferred.

5

her relationships with her superiors. Mary never returned to the Department, and instead remained on medical leave. Chicago Police Department regulations require that Mary undergo a fitness-for-duty evaluation prior to returning to work.

On April 10, 2000, Commander Walton and Lieutenant Roy spoke with John regarding allegations of sexual harassment. John told Commander Walton about Mary's allegations regarding Oseguera. Walton responded by instructing Roy to complete a confidential "complaint register," which is the means in which a complaint is filed against a police officer. The Internal Affairs Division (IAD) investigated Mary's allegation. Mary told the investigator about the September 1999 incident and the general remarks that Oseguera made about viagra and breast implants.

Shortly after John informed Commander Walton of Mary's allegations of sexual harassment, six sergeants received transfers to IAD. Although John had applied for a transfer in 1997, been interviewed in 1998, and been recommended for a transfer in March 2000, he was not among the six sergeants who received transfers to the IAD.

After receiving a right-to-sue letter from the EEOC, the Valentis filed this suit.

## II. Standard of Review

Summary judgment is appropriate only when the record, viewed in the light most favorable to the non-moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250 (1986). The role of this Court is to determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### III. Analysis

A. Mary's Discrimination Claim

*1. Disparate Treatment*

Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's sex. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may overcome a defendant's summary judgment motion in an employment discrimination case by using either the direct method or the indirect method. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003); *Sheehan v. Daily Racing Form, Inc.*, 104 F. 3d 940, 940 (7th Cir.1997). Under the direct method, the plaintiff must produce evidence, direct or circumstantial, that demonstrates the employer's decision to take an adverse job action against him was motivated by an impermissible purpose. *Cerutti*, 349 F.3d at 1060. If the circumstantial evidence points "directly to a discriminatory reason for the employer's action," then the plaintiff may proceed under the direct method. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir.2003). The Seventh Circuit identified several types of circumstantial evidence that might suffice. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736-37 (7th Cir. 1994). A plaintiff may point to: 1) evidence of behavior toward or comments directed at other employees in the protected group from which an inference of discriminatory intent might be drawn; 2) comparative evidence

7

that the supervisory employee bases decisions on discriminatory beliefs; or 3) evidence suggesting the supervisory employee's decisions were pretextual. *Id.*; *Venturelli v. ARC Comty. Serv., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003).

In this case, Mary presents no direct evidence of a discriminatory motive. She points to no smoking gun— a comment by Oseguera that he transferred Mary because of her gender.[7] Mary suggests, however, that Oseguera's derogatory comments regarding women, coupled with the fact that four women either left or were reassigned from the CPO during Oseguera's tenure there, provide circumstantial evidence of a discriminatory motive. Inappropriate, isolated comments that consist of no more than "stray remarks" will not suffice to create an issue of fact under the direct method. *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). But Oseguera's comments were hardly isolated. Officer Loni testified that Oseguera made comments regarding the appropriateness of women working for the police "a million times." Officer Graziano confirmed Oseguera's discriminatory beliefs regarding women. Moreover, in an office of approximately ten persons, four officers (all female) found themselves transferred out of the office (at least some of the transfers were involuntary, and those that were voluntary appear to be motivated by a desire to get away from Oseguera), while no men received or requested such transfers.

---

[7] Although Officer Graziano testified that Oseguera threatened to get rid of Mary, the threat was not because of her gender, but because Mary was "trying to do all this stuff here."

8

In its reply brief, the Defendant makes no argument that Mary's circumstantial evidence suffices under the direct method. Instead, the Defendant argues that under the direct method Mary must prove discrimination without the need for inference or presumption and that if Mary relies on circumstantial evidence she must instead resort to the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Defendant's description of the law is grossly inaccurate. A plaintiff can prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision maker. *Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003); *see also Venturelli*, 350 F.3d at 601; *Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998). The Court finds that Mary's circumstantial evidence of Oseguera's discriminatory intent is sufficient to defeat the Defendant's summary judgment motion. Mary points to circumstantial evidence of the first and second type identified by *Troupe*. First, Mary points to evidence that the Defendant repeatedly berated and belittled women because of their gender. In addition, she points to evidence that Oseguera harbored a discriminatory belief that women should not be part of the police force. There is more than sufficient evidence to allow a jury to infer that Oseguera held a discriminatory intent to remove women from the CPO. But Mary also points to evidence from which a jury could infer that Oseguera acted on that belief by transferring women who challenged his authority out of the CPO or made their lives so miserable that they sought to leave. During a two-and-a-half year period, four women found themselves transferred from the CPO under

Oseguera's command, while no men experienced such transfers. If believed by a jury, the evidence presented by Mary could support an inference that he transferred her from the CPO because of her gender. Defendant's motion to dismiss Mary's claim of discrimination based on disparate treatment is DENIED.

*2. Disparate Impact*

Mary also alleges Title VII sex discrimination under a disparate impact theory of liability. This is an untenable position. A disparate impact claim exists when a specific employment practice, which appears neutral on its face, has a disproportionate impact on a legally protected class of workers. *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996). Mary attempts to show that the voluntary and involuntary transfer of four women out of CPO, including herself, suggests that the Defendant had a policy that disparately impacted female employees. Aside from the fact that the sample size is too small to draw any such inference, Mary points to no specific Chicago Police Department policy that disparately impacted female officers. Although Mary alludes to Oseguera's "constructive removal" of women from the CPO office, this is not a Departmental policy. The Defendant's motion to dismiss Mary's claim of discrimination based on disparate impact is GRANTED.

B.  Hostile Work Environment

Mary also alleges that Sergeant Oseguera's behavior created a hostile work environment. To show a hostile work environment, Mary must establish that: (1) she experienced unwelcome sexual advances, requests for sexual acts, or experienced any other verbal or sexual conduct; (2) the sexual conduct was so severe or pervasive to

10

establish a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability. *Quantock v. Shared Mktg. Serv., Inc.*, 312 F.3d 899, 903 (7th Cir. 2002). Defendant argues that Oseguera's conduct was not sufficiently severe or pervasive and that there is no basis for employer liability.

In order to prevail on a hostile work environment claim, a plaintiff must submit evidence to demonstrate that she was subjected to sexual misconduct "so severe or pervasive as to alter the conditions of her employment and create an abusive working environment." *Quantock*, 312 F.3d at 903. Normally, a single, isolated comment does not rise to the level necessary to establish sexual harassment, *Galloway v. General Motors Serv. Parts Ops.*, 78 F.3d 1164, 1167 (7th Cir. 1996) (noting that it is difficult to determine the context in which a solitary comment is made), but a plaintiff need not prove that the conduct was severe *and* pervasive—one or the other will do. *See Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2003). For a plaintiff to prove that she was exposed to a severe or pervasive hostile environment, she must prove that the words or actions to which she was subjected were both objectively and subjectively hostile. *Id.* The resolution of this fact-intensive inquiry "is not, and by its nature cannot be, a mathematically precise test." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Courts must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at

23. Drawing the line is not always easy, but the Seventh Circuit has identified basic categories of behavior to guide Courts in this inquiry. "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures . . . On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

The Defendant argues that Oseguera's September 1999 comments to Mary were mere vulgar banter tinged with sexual innuendo and thus were "innocuous at best." The Court disagrees. Oseguera called Mary into his office to speak with her privately. Once in his office, he engaged not in a casual conversation about work, but instead told Mary that he fantasized about having sexual relations with two women. He also told her, immediately following this comment, that if she were not married, he would be dating her. Oseguera's behavior can hardly be described as innocuous. A jury could easily infer that Oseguera called Mary into his office, privately, in order to make an uninvited sexual solicitation. What is more, Mary has produced evidence that demonstrates that Oseguera frequently referred to women in derogatory terms, expressed his sexual desires about various female officers, and espoused a belief that the only thing women were good for was to "fuck them and then run them." Of course, Mary was not privy to all of these comments, but a jury could rely on these other comments to infer that Oseguera did intend to invite Mary to have sexual relations with him during the September 1999 conversation. Moreover, Mary also produced

12

evidence that Oseguera frequently and publicly derided women because of their gender and expressed his belief that women did not belong on the police force. This kind of behavior is the precise type of behavior that Title VII was enacted to prevent, and Officer Loni's testimony that Oseguera made these comments "a million times" suggests that not only was his conduct severe, but also pervasive.

Defendant argues that Mary was not even subjectively offended by Oseguera's remarks because she was not crying when she relayed them to her coworkers and because she did not immediately file a claim that Oseguera sexually harassed her. But the mere facts that Mary did not cry when she relayed Oseguera's unsolicited comments to her coworkers and that she did not report Oseguera's behavior do not conclusively establish her mental state. Certainly a jury might draw such an inference. But Mary also testified that she thereafter avoided Oseguera and that she was afraid to report him for fear of retaliation, and so a jury might just as readily draw a different inference.

Defendant also argues that there is no basis for employer liability. This argument is without merit. Defendant claims that Oseguera was not a supervisor because he did not have the power to affect the terms and conditions of Mary's employment. However, Mary submitted evidence that suggested that Oseguera initiated Mary's transfer. Commander Walton admitted that he allows Oseguera to pick the people assigned to the CPO—and thus could not only initiate Mary's transfer, but made the only meaningful decision regarding Mary's reassignment from the CPO. Moreover, Oseguera certainly had the authority to discipline Mary, as evidenced by the

13

fact that he lowered her performance evaluation. The Defendant's motion to dismiss Mary's claim for hostile work environment harassment is DENIED.

## C. John's Retaliation Claim

Finally, John complains that after he reported Mary's allegation to Commander Walton, the Defendant retaliated against him. In response, the Defendants once again misstate the law. Defendants argue that *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002) replaced the *prima facie* case for retaliation. But *Stone* merely created an indirect method for a plaintiff to prove retaliation; it did not do away with the direct method (which requires a plaintiff to show a causal link between protected activity and the adverse employment action). *See Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003); *Stone*, 281 F.3d at 644 (discussing the application of the direct method). Defendant's misstatement, however, is immaterial because both the direct and indirect methods of proving retaliation require a plaintiff to establish that he suffered an adverse employment action, which John cannot do. *See Stone*, 281 F.3d at 644-45.

An adverse employment action is one that significantly alters the terms and conditions of the employee's job. *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir.2001). While an adverse employment action need not be measured solely by pay or benefits, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996); *see also Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir.2003) (harder work assignments);

*Stutler*, 263 F.3d at 702-03 (lateral transfer without loss of benefits, increased commute); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691-92 (7th Cir.2001) (additional job responsibilities); *Grube v. Lau Indus.*, 257 F.3d 723, 728 (7th Cir.2001) (altered work hours, negative performance evaluations, unfair reprimands); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir.2001) (oral and written reprimands); *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir.2000) (trivial matters); *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir.2000) (refused preferred vacation schedule); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir.1989) (increased travel time).

John points to three potentially adverse employment actions: 1) that his request for overtime pay was reduced by 1.5 hours; 2) that he was subjected to random drug tests after reporting Mary's allegations to Commander Walton; and 3) that he was denied a transfer to Internal Affairs Division (IAD) after reporting Mary's allegations. John's first two arguments can be dispatched quickly. It is absurd to think that a plainly trivial reduction in overtime of 1.5 hours can support a claim for retaliation. The terms and conditions of John's employment were not changed. Moreover, there is unrebutted evidence that the Defendant merely erred when it failed to reduce another Sergeant's overtime by the same amount and that it corrected the error once it learned of its mistake. The Court can conceive of some instances where suddenly subjecting an employee to drug tests might be an adverse employment action. But here, John offers no evidence that he received any discipline because of the drug tests. Nor does he offer any evidence that he was aware how frequently his colleagues were subjected

15

to random drug tests. Without such evidence, John cannot establish that these tests constitute an adverse employment action.

John's failure to receive a transfer to IAD also fails to rise to the level of an adverse employment action. A transfer to the IAD would not be accompanied with an increase in pay nor would it require John to pass a test, which the Department requires whenever an officer is promoted. A lateral transfer can, however, sometimes provide the basis for an adverse employment action when the transferee's job responsibility are significantly diminished. *See Bryson*, 96 F.3d at 916; *see also Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir. 1987); *but see Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) (no adverse employment action in discrimination case when employee was transferred from investigations to audits even though employee found investigations more challenging and interesting than audits, and investigators did not have to sign in and out of the office and could use a company car). Here, John argues that the denial of his transfer to the IAD is an adverse employment action because the IAD is a "more desirable job." In his statement of facts, John notes that he wanted to work in the IAD because (1) it was a day position; (2) John would have weekends off; (3) John could at times use a car; (4) IAD sergeants work in civilian clothes; and (5) investigating other officers was more desirable than usual "beat" duties. But as noted earlier an adverse employment action is not something that makes an employee unhappy, but something that materially affects the terms and conditions of employment. John does not point to any evidence to establish that the failure to transfer him to the IAD inhibited his ability to advance in the

Chicago Police Department. He merely states a preference for doing one kind of investigatory work over the work on the watch, which is insufficient in establishing an adverse employment action. *See Herrnreiter*, 315 F.3d at 745. The Defendant's motion for summary judgment regarding John's retaliation claim is GRANTED.

## IV. Conclusion

For the forgoing reasons, the Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

_2/20/04_
Dated

_Wm. J. Hibbler_
The Honorable William J. Hibbler
United States District Court

17